# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JESSICA J. SPEARS, | ) | CASE NO. 5:17CV114 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Jessica J. Spears ("Plaintiff" or "Spears"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be VACATED and the case REMANDED for further proceedings

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

consistent with this decision.

## I. PROCEDURAL HISTORY

In August 2013 and March 2014, Spears filed applications for POD, DIB, and SSI,[2] alleging a disability onset date of March 30, 2012 and claiming she was disabled due to "grand mal seizures spinal stenosis, osteoarthritis; spinal injury, cervical and lumbar stenosis; degenerative disc disease/osteoarthritis/spondylosis; cervical radiculopathy/intervertebral disk displacement; seizure disorder: NOS uncontrolled; major depression/bipolar/anxiety disorder; fibromyalgia; post traumatic stress disorder; borderline personality disorder; hyperthyroidism; [and] hormone deficiency." (Transcript ("Tr.") 20, 213, 220, 248.) The applications were denied initially and upon reconsideration, and Spears requested a hearing before an administrative law judge ("ALJ"). (Tr. 20, 154-156, 163-174, 175.)

On October 7, 2015, an ALJ held a hearing, during which Spears, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 39-82.) On December 14, 2015, the ALJ issued a written decision finding Spears was not disabled. (Tr. 20-38.) The ALJ's decision became final on November 20, 2016, when the Appeals Council declined further review. (Tr. 1-6.)

On January 13, 2017, Spears filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 11, 14, 20.)

---

[2] The record reflects Spears filed previous applications for POD, DIB, and SSI in September 2010, alleging a disability onset date of January 6, 2009. (Tr. 86.) These applications were denied initially and upon reconsideration, and Spears requested a hearing before an administrative law judge ("ALJ"). (*Id.*) On March 21, 2012, an ALJ held a hearing, during which Spears, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On March 29, 2012, the ALJ issued a written decision finding Spears was not disabled. (Tr. 86-106.)

Spears asserts the following assignments of error:

(1) The ALJ's residual functional capacity found Plaintiff capable of frequent fine and gross handling bilaterally. This finding is in error because the ALJ assigned "little weight" to the opinions of the State Agency medical consultants, reasoning that "later records and the claimant's testimony reveal that further limitations are warranted." However, the ALJ found Plaintiff more capable than the medical consultants found, and he failed to adequately assess Plaintiff's symptoms.

(2) The ALJ found at step five of the sequential evaluation process that Plaintiff had the ability to perform jobs that exist in significant numbers in the national economy. This finding is in error because the ALJ relied upon vocational expert opinion which was based upon a hypothetical question unsupported by the evidence.

(Doc. No. 11.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Spears was born in April 1970 and was forty-five (45) years-old at the time of her administrative hearing, making her a "younger" person under social security regulations. (Tr. 31.) *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c). She has at least a high school education and is able to communicate in English. (Tr. 32.) She has past relevant work as a case worker. (Tr. 31.)

### B.    Relevant Medical Evidence

As Spears' grounds for relief relate solely to her physical impairments, the Court's recitation of the medical evidence will be limited to those impairments, with a particular emphasis on Spears' complaints regarding pain, numbness, and tingling in her arms and hands.[3]

On April 19, 2012, Spears presented to rheumatologist Inderprit Singh, M.D., for follow

---

[3] The Court further notes that its recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

up regarding her fibromyalgia complaints.  (Tr. 422-423.)  She complained of "intolerable" low back pain, as well as hip and "generalized body" pains.  (Tr. 422.)  Of particular relevance, Spears also reported pain in her PIP joints, decreased grasp, and numbness in her bilateral hands. (*Id*.)  On examination, Dr. Singh found decreased range of motion in the cervical and lumbosacral spines.  (*Id.*)  With regard to Spears' wrists and upper extremity joints, Dr. Singh noted full range of motion, no localized swelling, and no signs of synovitis.  (*Id*.)  He referred Spears to physical therapy. (Tr. 423.)

Spears thereafter presented to Summit Pain Specialists on April 26, 2012.  (Tr. 760-763.) She complained of pain in her neck, low back, and hips, which she rated a 5/6 on a scale of 10. (Tr. 760.)  Examination revealed 4-5/5 strength in her bilateral upper and lower extremities, tenderness in her lumbar spine and right sacroiliac joint, and "over 30 tender points, above and below the waist, front and back all 4 quadrants non-radiating very consistent with fibromyalgia symptoms."  (Tr. 762.)  X-rays of Spears' hips showed mild degenerative changes.  (Tr. 641.)

Spears returned to Summit Pain Specialists in May and June 2012.  (Tr. 756-758, 752-755.)  In May 2012, Spears complained of fibromyalgia pain in her lower back and shoulders. (Tr. 756-758.)  On examination, physician Dr. Bressi noted pain on palpation of the lumbar spine but no muscle tightness, spasms, or radicular pain.  (Tr. 758.)  Dr. Bressi found 10/18 tender points, and diagnosed fibromyalgia.  (*Id*.)  The following month, Spears returned to Dr. Bressi with complaints of lower back, neck, and ankle pain.  (Tr. 752-755.)  She also reported numbness in her bilateral legs, and stated her shoulders and ankles were "bothersome."  (Tr. 754.)  On examination, Dr. Bressi noted pain on palpation of the lumbar spine, and radicular pain following L5.  (*Id.*)  He continued Spears on her medications.  (*Id*.)

4

On June 22, 2012, Spears returned to Dr. Singh for a follow-up regarding her fibromyalgia.  (Tr. 372-379.)  She complained of "generalized body pain, difficulty with exertion, fatigue, [and] spasms," which she described as continuous and "worsening."  (Tr. 372.)  Examination of Spears' upper extremity joints and hands was normal; however, Dr. Singh did note limited range of motion in Spears' hips, as well as limited range of motion and tenderness in her cervical, thoracic, and lumbar spines.  (Tr. 375-376.)  An x-ray of Spears' lumbar spine taken that date showed (1) minimal multilevel lumbar degenerative disease; (2) mild multilevel lower thoracic degenerative disc disease; and (3) left L4-L5 facet joint arthrosis.  (Tr. 639.)

Spears presented to Dr. Yang at Summit Pain Specialists on July 2, 2012.  (Tr. 748-751.)  She complained of pain in her lumbar spine, but denied radiculopathy.  (Tr. 750.)  Dr. Yang recommended bilateral lumbar facet joint injections, which Spears underwent on July 31, 2012, August 7, 2012, and August 14, 2012.  (Tr. 743-747, 738-742, 734-737, 750-751.)

On August 22, 2012, Spears returned to Dr. Singh with complaints of pain in her back, neck, knees and hips.  (Tr. 380-388.)  She also stated her "arms go to sleep," and reported mild wrist pain, hand pain/cramping, reduced grasp, and morning stiffness for two hours.  (Tr. 381-382.)  Examination of Spears' upper extremity joints and hands was again normal.  (Tr. 384-385.)  Dr. Singh did note limited range of motion in Spears' hips, as well as limited range of motion and tenderness in her cervical, thoracic, and lumbar spines.  (Tr. 385.)  With regard to Spears' neck pain, Dr. Singh noted that a May 2011 CT scan showed mild kyphosis, mild spinal stenosis, and mild left neural foraminal narrowing at C4-C5.  (Tr. 388.)  He also noted that a 2009 nerve conduction study of Spears' bilateral upper and lower extremities was negative.  (*Id.*)

Spears presented to Dr. Geiger at Summit Pain Specialists in September and October

2012.  (Tr. 731-733, 727-730.)  In September, she complained of "global body pain" and indicated her hips and knees were the most painful that day.  (Tr. 731, 733.)  Spears also reported the injections "did not help at all."  (*Id*.)  Dr. Geiger found 12/18 tender points, and diagnosed lumbar disc degeneration, lumbar spinal stenosis, lumbar/thoracic radiculitis, and fibromyalgia.  (Tr. 733.)  The following month, Spears denied radiculopathy but stated her "legs are aching." (Tr. 729.)  Dr. Geiger continued Spears on her medications.  (*Id.*)

On October 12, 2012, Spears returned to Dr. Singh with complaints of generalized body pain and "uncontrolled" spasms.  (Tr. 389-395.)  She again reported her "arms go to sleep," and complained of mild wrist pain, hand pain, reduced grasp, and morning stiffness.  (Tr. 390.) Examination of Spears' upper extremity joints and hands was again normal, but Dr. Singh did note limited range of motion and tenderness in her cervical, thoracic, and lumbar spines.  (Tr. 393.)

On October 24, 2012, Spears returned to Dr. Yang with complaints of increased pain in her lumbar spine, bilateral feet and ankles, and thoracic spine.  (Tr. 723-726.)  Dr. Yang increased her pain medication.  (Tr. 725.)  On November 27, 2012, Spears stated her "pain is mostly in her lumbar spine and hips," noting it worsened with movement.  (Tr. 721.)  On December 18, 2012, Spears denied radiculopathy and reported improvement with pool therapy. (Tr. 717.)

Spears returned to Dr. Yang on January 21, 2013.  (Tr. 710-714.)  She complained of back pain, which she described as "achy" and "burning" and rated a 4 on a scale of 10.  (Tr. 710, 712.)  Dr. Yang ordered lumbar facet joint injections, which Spears underwent later that month. (Tr. 705, 713.)

6

On February 14, 2013, Spears returned to Dr. Singh for follow-up of her fibromyalgia. (Tr. 398-407.)  She complained of pain in her neck, shoulders, elbows, wrists, hands, fingers, upper and lower back, hips, knees, ankles, feet, and toes.  (Tr. 399.)  Spears rated the pain an 8 on a scale of 10, and expressed concern about "progression of [her] joint issues."  (*Id.*)  Examination of Spears' upper extremity joints and hands was normal; however, Dr. Singh noted limited range of motion in Spears' hips and knees, bilateral knee enlargement with crepitus, and limited range of motion in her cervical, thoracic, and lumbar spines.  (Tr. 402-403.)

Several days later, Spears returned to Dr. Yang, with complaints of pain in her neck, joints, and right arm.  (Tr. 700-704.)  She denied radiculopathy, but stated her "arms sometimes fall asleep" and her knees and hands "are very stiff."  (Tr. 702.)  Dr. Yang ordered lumbar caudal steroid epidural injections, which Spears underwent on February 22, 2013.  (Tr. 695-699, 703.)

On March 7, 2013, Spears presented to Dr. Singh.  (Tr. 408-414.)  She stated she was feeling better since the injection, but complained of increased joint pain.  (Tr. 408.)  Among other things, Spears reported pain in her shoulders, elbows, wrists, hands, hips, knees, ankles and feet, with the worst pain in her hips.  (Tr. 408-409.)  Examination of Spears' upper extremity joints and hands was normal.  (Tr.  411-412.)

Spears returned to Dr. Yang in March, April and May 2013.  (Tr. 691-694, 682-685, 678-681.)  In March, Spears stated her low back pain had improved since the injections, but indicated the "injections have started to wear off."  (Tr. 693.)  She also reported global body pain, which she described as "stiff and aching" and rated a 5 on a scale of 10.  (Tr. 691, 693.)  Spears underwent another lumbar caudal steroid epidural injection on March 22, 2013.  (Tr. 686-690.)  In April, Spears complained of sharp, stabbing, burning pain in her lower back radiating down

her right leg to the lateral aspect of her ankle.  (Tr. 682, 684.)  Dr. Yang prescribed Celebrex.

(*Id.*)

In May, Spears described her low back pain as "tolerable" and denied radiculopathy.  (Tr. 680.)

On June 6, 2013, Spears presented to Dr. Singh, complaining of worsening neck,

shoulder, elbow, wrist, hand, back, hip, knee, ankle, and foot pain and tenderness.  (Tr. 415-421.)

Examination of Spears' upper extremity joints and hands was normal; however, Dr. Singh noted

limited range of motion in Spears' cervical and lumbar spines.  (Tr. 418-419.)

Spears returned to Dr. Yang on two occasions in June 2013 with complaints of neck,

back, and leg pain.  (Tr. 674-677, 669-673.)  On each occasion, Dr. Yang diagnosed lumbar disc

degeneration, lumbar spinal stenosis, lumbar/thoracic radiculitis, fibromyalgia, and gastritis.  (Tr.

671-672, 676.)  Spears thereafter underwent lumbar/caudal injections on July 18 and 25, 2013.

(Tr. 665-668, 661-664.)

On July 31, 2013, Spears reported the injections had improved her pain by 50%.  (Tr.

659.)  She indicated, however, that she had recently had a grand mal seizure and her neck had

been "very achy" ever since.  (*Id.*)  Examination revealed pain to palpation in Spears' cervical

spine, but no muscle spasms, spinal deformity, or radicular pain.  (*Id.*)  Dr. Yang added a

diagnosis of cervicalgia.  (*Id.*)

Several weeks later, Spears presented to neurologist Zhong Ying, M.D., at the Cleveland

Clinic Epilepsy Center for follow up regarding her "breakthrough spells."  (Tr. 597-605.)  Dr.

Ying noted Spears had stopped taking her anti-seizure medication in June 2011 and had been

"spell free" until her latest episode on July 29, 2013.  (Tr. 597.)  Dr. Ying also noted Spears'

complaints of worsening neck and back pain, arm numbness/tingling, hand numbness, chronic

8

fatigue.  (Tr. 597-599.)  On examination, Dr. Ying found 5/5 strength in Spears' upper and lower extremities, normal muscle tone, intact sensation, normal reflexes, normal coordination (finger to nose), and normal gait.  (Tr. 600.)  Spears was referred to the neurology clinic for worsening neck and back pain and "arms tingling."  (*Id*.)

On August 22, 2013, Spears presented to Lynn Jedlicka, M.D., in the Physical Medicine and Rehabilitation department, for an initial evaluation of her neck pain.  (Tr. 606-620.)  Spears complained of pain in her neck and upper shoulders, as well as associated numbness, tingling, and cramping in her hands and forearm "brought on with lifting, painting."  (Tr. 606.)  On examination, Dr. Jedlicka found (1) "notable increased mild tone in the cervical musculature and tenderness to palpation;" (2) 10/18 tender points; (3) slightly impaired range of motion in Spears' neck; (4) normal reflexes; (5) intact sensation; (6) negative Hoffman's and Babinski's; and (7) no clonus.  (Tr. 610-611.)  Dr. Jedlicka ordered an MRI of Spears' cervical spine.  (Tr. 611.)

Spears underwent the MRI on August 30, 2013.  (Tr. 632-633.)  This MRI showed "moderate multilevel cervical spondylosis superimposed on developmentally narrow spinal canal producing moderate central canal stenosis and spinal cord deformity most severe at the C5/C6 level and C6/C7 levels, mildly increased from the prior examination."  (*Id*.)

Several days later, on September 3, 2013, Spears returned to Dr. Yang, with complaints of neck pain radiating down her arms and "caus[ing] them to go numb."  (Tr. 655.)  She also reported low back pain, exacerbated by cold and rainy weather.  (*Id*.)  Dr. Yang encouraged Spears to continue pool therapy and schedule another injection.  (Tr. 656.)

On September 26, 2013, Spears returned to Dr. Jedlicka for follow up regarding her neck

pain.  (Tr. 621-631.)  Dr. Jedlicka interpreted Spears' MRI as showing "notable canal/foraminal stenosis at C4-7 and facet/degenerative changes," but noted it did "not look like [it] was significantly worse" than her cervical MRI back in 2011.  (Tr. 626.)  She ordered an EMG due to Spears' bilateral hand numbness and tingling.  (*Id*.)  Spears subsequently underwent a bilateral Nerve Conduction Test ("NCT") and EMG on October 22, 2013, which showed (1) electro-physiological evidence of distal right median nerve mononeuropathy across the wrist, indicated carpal tunnel syndrome, mild severity; and (2) cervical radiculopathy at right C6 and C7 level. (Tr. 646.)

On October 1, 2013, Spears complained to Dr. Yang of neck stiffness, pain, and swelling, as well as intermittent numbness in her arms and hands.  (Tr. 651.)  Dr. Yang diagnosed cervical radiculitis/brachial neuritis, cervicalgia, fibromyalgia, and gastritis.  (*Id*.)  Several weeks later, Spears again complained of neck pain and stiffness, stating "the pain radiates down her arms to her middle digits."  (Tr. 644.)  On cervical examination, Dr. Yang noted pain to palpation, muscle tightness/spasm, radicular pain following C6/C7, and normal range of motion.  (*Id*.)

On November 6, 2013, Spears presented to Benjamin Prestegaard, D.O., for an annual examination.  (Tr. 1033-1039.)  She complained of fatigue, pain, and stiffness.  (Tr. 1034.)  On orthopedic examination, Dr. Prestegaard noted pain on palpation to the PIP joint of the fourth finger of Spears' right hand, along with "some bony deformity" and reduced range of motion with flexion.  (Tr. 1038.)

Spears returned to Dr. Singh on February 13, 2014.  (Tr. 894-901.)  She complained of pain in her neck, low back, and hands.  (Tr. 895.)  Physical examination findings were normal, and Spears was continued on her medications.  (Tr. 898-899.)

10

Several days later, on February 19, 2014, Spears presented to Dr. Yang with complaints of throbbing, burning and numbness in her lower back, arms, and legs.  (Tr. 874.)  She also reported "constant neck achiness worse with activity," and indicated her "arms go to sleep multiple times per day."  (Tr. 875.) Dr. Yang diagnosed cervical radiculitis/brachial neuritis and lumbar facet arthropathy, and ordered caudal injections.  (Tr. 876.)

Spears returned to Dr. Geiger on March 19, 2014.  (Tr. 871-873.)  She reported pain in her neck, lower back, and feet, along with arm and leg numbness.  (Tr. 872.)  Dr. Geiger ordered a lumbar MRI, and noted Spears was due to have a lumbar injection the next day.  (Tr. 873.)

On August 6, 2014, Spears reported gradually increased pain in her cervical spine and shoulders.  (Tr. 988.)  Examination revealed tenderness and tightness at the cervical and lumbar paraspinals, but was otherwise normal.  (*Id*.)  Dr. Yang ordered another round of injections.  (Tr. 989.)

On October 2, 2014, Spears returned to Dr. Geiger with complaints of right sided sacroiliac joint pain, "multi-joint achiness," and "intense cramping on her hands and feet."  (Tr. 983.)  Examination revealed pain on palpation in her cervical and lumbar spines, limited lumbar range of motion, and tenderness in her right sacroiliac joint, but was otherwise normal.  (*Id*.)  Dr. Geiger advised Spears to continue her medications, prescribed a lumbar corset brace "to improve spinal support," and ordered SI joint injections.  (Tr. 984.)  Later that month, Spears complained of pain in her neck, lower back, and "all joints."  (Tr. 976.)  Dr. Geiger noted 12/18 tender points, and increased her Flexeril dosage due to "intense spastic neck pain."  (Tr. 977-978.)

On December 26, 2014, Spears complained of continuing pain across her lower back and throbbing neck pain and swelling.  (Tr. 968.)  She expressed an interest in seeing a surgeon for

her lower back pain.  (*Id.*)  Dr. Geiger ordered bilateral SI joint injections, and referred Spears

for a surgical consult.  (Tr. 969.)  Spears underwent the injections on January 16, 2015.  (Tr.

962-966.)

   Spears returned to Dr. Singh on February 3, 2015.  (Tr. 902-911.)  She complained of

pain in her neck, lower back, hands, hips, knees, ankles and feet.  (Tr. 903.)  Physical

examination findings were normal, with the exception of limited range of motion in Spears'

cervical, thoracic, and lumbar spines.  (Tr. 906-907.)  At the conclusion of this treatment note,

Dr. Singh offered the following opinion:

> Patient has been followed in my clinic since 2009.  She has been medically unfit
> to work for the last couple of years.  It is my professional opinion that the patient
> with all her underlying medical problems is unable to do any substantial gainful
> work, and her impairment[s] have lasted 12 months and are expected to last at
> least 12 months in a row.  Patient is to a reasonable degree of medical certainty
> totally medically disabled for life.

(Tr. 911.)

   On February 20, 2015, Spears returned to Dr. Geiger with complaints of constant aching

in her lower back and joints.  (Tr. 959-961.)  She did, however, report "significant improvement"

from her SI joint injection, and noted she had "started to exercise and got a new membership to

the Y." (Tr. 960.)  Spears also stated she had seen a surgeon who determined she was not a good

surgical candidate.  (*Id.*)  In April, Spears complained of continuing lower back pain and cervical

spine pain, but reported improvement since joining the YMCA and increasing her activity.  (Tr.

957.)

   On June 5, 2015, Spears returned to Dr. Geiger.  (Tr. 950-954.)  She stated she was doing

well, aside from right sided SI joint tenderness and lower back pain.  (Tr. 952.)  Dr. Geiger

ordered right sacroiliac joint injections, which Spears underwent on June 16, 2015 and July 27,

2015.  (Tr. 953, 945-949, 941-944.)  Several months later, on August 7, 2015, Spears reported she "does continue to have chronic aching lumbar pain that has improved since last visit."  (Tr. 939.)  She indicated she was doing aquatic therapy, and was interested in reducing her medications.  (*Id.*)

Meanwhile, on August 4, 2015, Spears presented to Dr. Singh with complaints of pain in her neck, low back, shoulders, elbows, wrists, hands, hips, knees, ankles, and feet.  (Tr. 913.) Physical examination findings were normal, with the exception of limited range of motion in Spears' cervical, thoracic, and lumbar spines.  (Tr. 918-919.)

On August 23, 2015, Spears presented to the emergency room with complaints of dizziness, nausea, and "concerns that she may have had a seizure."  (Tr. 1185-1190.)  The attending physician noted normal range of motion in Spears' neck, no tenderness in her back, and normal range of motion and motor strength in her upper and lower extremities.  (Tr. 1186.) Spears did, however, have a left temporal contusion, a small abrasion to her lower lip, and diffuse neck tenderness.  (Tr. 1186-1187.)

CT scans were taken that date of Spears' brain and cervical spine.  (Tr. 1205-1206.)  The CT of her brain revealed "minimal chronic microvascular ischemia of the white matter," but was otherwise normal.  (*Id.*)  The CT of her cervical spine showed (1) multilevel mild appearing degenerative disc space narrowing; (2) mild appearing central canal stenosis secondary to disc osteophyte at C4-C5; and (3) mild appearing left-sided canal stenosis secondary to disc osteophyte at C5-C6.  (*Id.*)

**C.      State Agency Reports**

On December 31, 2013, state agency physician William Bolz, M.D., reviewed Spears'

13

records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 114-117.)  Dr. Bolz determined Spears could occasionally lift and carry 10 pounds and frequently lift and carry less than 10 pounds; stand and/or walk for a total of 2 hours in an 8 hour workday; and sit for a total of 6 hours in an 8 hour workday.  (Tr. 115.)  He further found she could occasionally push and pull and must be able to stand and sit alternatively, at will.  (*Id*.)  Dr. Bolz found Spears had an unlimited capacity to climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; but could never climb ladders, ropes and scaffolds.  (*Id*.)  He found she had an unlimited capacity to reach, finger and feel, but could only occasionally handle (i.e., gross manipulation). (Tr. 115-116.)  Finally, Dr. Bolz determined Spears should avoid all use of moving machinery and all exposure to unprotected heights.  (Tr. 116.)  Dr. Bolz explained his opinion was an adoption of the RFC assessed by the previous ALJ in the March 29, 2012 decision.  (*Id.*)

On April 15, 2014, state agency physician Elaine Lewis, M.D., reviewed Spears' records and completed a Physical RFC Assessment.  (Tr. 131-134.)  Dr. Lewis also adopted the RFC assessed by the previous ALJ in the March 29, 2012 decision.[4]  (Tr. 132.)

**D.     Hearing Testimony**

During the October 7, 2015 hearing, Spears testified to the following:

- She graduated from high school, and recently earned a bachelor's degree in Criminal Justice from Kent State.  (Tr. 47.)  She lives alone in a two story townhouse.  (Tr. 46.)

- For the previous six months, she has worked a few hours a week booking bands

---

[4] While Dr. Lewis states she is adopting the RFC assessed by the previous ALJ, the Court notes Dr. Lewis indicates Spears can stand and/or walk for 6 hours in an 8 hour workday as opposed to 2 hours as set forth in the March 2012 ALJ decision.  *Compare* Tr. 91, 132. In light of her express adoption of the previous RFC, the Court construes Dr. Lewis' use of a 6 hour standing/walking restriction to be a clerical error.

14

for a café in downtown Akron.  (Tr. 49-50.)  She also hosts a radio program every Monday night for one hour.  (Tr. 50.)  Prior to that, she worked as a mental health case manager.  (Tr. 51-53.)  In that job, she was primarily on her feet all day.  (*Id*.)

- The main thing that prevents her from working is her chronic pain.  (Tr. 54.)  Specifically, she experiences continuous, daily pain in her lower back and neck, as well as muscle spasms.  (*Id*.)  Her pain is worse with any kind of physical activity or exertion that lasts more than 20 minutes.  (*Id*.)  She takes medication and has had injections which provided only "brief" relief.  (Tr. 54-55.)  She met with a surgeon, but he did not feel she was a good candidate for surgery.  (Tr. 56.)

- Her pain radiates down her arms "all the way to her fingers," worse on the right than the left.  (Tr. 56-57.)  As a result, she has difficulty buttoning shirts, tying her shoes, zipping zippers, putting on jewelry, washing dishes, playing the piano, and writing.  (Tr. 57, 61.)  She also experiences numbness in her fingertips, which causes her to drop things.  (Tr. 65-66.)  She drops dishes every time she tries to wash them and can lift no more than five to ten pounds.  (Tr. 65-66.)

- She also experiences radiating pain and numbness in her legs.  (Tr. 56.)  She feels numb in her legs if she sits for too long, i.e., more than one hour.  (Tr. 70.)  She has difficulty sleeping, limited energy, and feels "tired all the time."  (Tr. 59, 69.)

- She can walk 100 feet before taking a break, and can stand for 15 minutes before needing to sit down.  (Tr. 60.)  She can sit for no more than 45 minutes to 1 hour before needing to stand.  (Tr. 70.)

- She also suffers from depression, anxiety, and panic attacks.  (Tr. 57-58.)  When having a panic attack, she cannot focus, feels very scared, and is unable to make decisions.  (Tr. 57-58.)  Her panic attacks last between 15 minutes and one and a half hours.  (*Id*.)  She has difficulty concentrating and making decisions.  (Tr. 59-60.)  She is "average to good" with people.  (Tr. 59.)  She sees a psychiatrist and mental health counselors.  (Tr. 59-60.)

- She takes numerous medications for her physical and mental conditions, including Cymbalta, Synthroid, Prednisone, Opana, Vicodin, Flexeril, Buspar, and Trazadone.  (Tr. 55.)  Her psych meds impair her judgment for four to six hours.  (Tr. 55-56.)

- She does her own grocery shopping, but cannot carry anything heavy.  (Tr. 61.)  She does the dishes but often drops them.  (*Id*.)  She does the cooking and

15

laundry, but asks her adult children to help her.  (*Id.*)  She generally has to call her children to help her about seven days per month. (Tr. 68.)  She feels "pretty decent" for about two weeks out of each month. (Tr. 66-67.)  The rest of the month, however, she has flare-ups during which she has increased pain and difficulty getting out of bed.  (*Id.*)

•   Her hobbies include listening to music, painting, doing crafts, reading, watching movies, and visiting with her children.  (Tr. 62-63.)  She used to play the piano but can no longer do so because of her arm/hand pain and numbness.  (Tr. 57, 71.)

•   Since the last ALJ decision in March 2012, her arthritis pain and stiffness is worse.  (Tr. 71.)  In addition, her hand pain and numbness has worsened.  (*Id.*)

The VE testified Spears had past work as a case worker (DOT 195.107-010, sedentary

performed as light, SVP 7).  (Tr. 73.)  The ALJ then posed the following hypothetical question:

Please assume we're dealing with an individual the same age, education, work experience, as the claimant for all hypotheticals.  And I have several here.  So let's start with– light [as] typically defined,[5] frequently climb ramps, stairs, never ladders, ropes or scaffolds, avoid concentrated exposure to respiratory irritants such as fumes, odors, dust and temperature extremes, and avoid all exposure to hazards such as dangerous moving machinery and unprotected heights.  Simple to moderately complex tasks with no strict time or strict high production quotas.

(Tr. 74.)

The VE testified the hypothetical individual would not be able to perform Spears' past

work as case worker, but would be able to perform other representative jobs in the economy,

---

[5]"Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  20 CFR § 404.1567(b).  Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

16

such as laundry folder (light, unskilled, SVP 2); cashier (light, unskilled, SVP 2); and ticket taker (light, unskilled, SVP 2).  (Tr. 75.)

The ALJ then asked the VE to consider the same hypothetical with the additional limitation that the individual would be limited to frequent fine and gross handling bilaterally. (Tr. 75.)  The VE testified the hypothetical individual would be able to perform the previously identified jobs of laundry folder, cashier, and ticket taker.  (*Id.*)

The ALJ then asked the VE to "reduce to sedentary,[6] keeping all limitations in hypo 1 as well as the frequent fine and gross."  (*Id.*)  The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as toy stuffer (sedentary, unskilled, SVP 2); telemarketer (sedentary, semi-skilled, SVP 3); and surveillance system monitor (sedentary, unskilled, SVP 2.)  (Tr. 75-76.)  With regard to the surveillance system monitor job, the VE explained as follows:

> Let me note I'm working, I work from a significantly updated description of this job.  It comes from the industry and updated numbers from the industry.  The government documents are very old on this one.  I have 291,000 jobs in surveillance system monitor currently.

(Tr. 76.)

---

[6] "Sedentary work" is defined as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 CFR § 404.1567(a).  SSR 83–10 provides that "Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8–hour workday, and sitting should generally total approximately 6 hours of an 8–hour workday. " SSR 83–10, 1983 WL 31251 (1983).  This SSR also notes that "most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions."  *Id*. at * 5.

The ALJ then asked "if we added in the additional limitation [that] this person would need to be able to alternate between a sitting/standing position at will, [w]ould that have any impact?"  (Tr. 76.)  The VE testified a sit/stand at will limitation would erode the job base with respect to two of the three identified jobs.  (*Id*.)  Specifically, he testified the surveillance system monitor job would be eroded to 161,000 (down from 291,000) jobs; and the telemarketer job would be eroded to 80,000 (down from 160,000) jobs.  (Tr. 76-77.)  The toy stuffer job would remain as cited (i.e., 4,000 jobs).  (Tr. 75,77.)

The ALJ then asked "if I modified from frequent to occasional fine and gross manipulation bilaterally, [is there] any work?"  (Tr. 77.)  The VE testified the only job that would remain would be the surveillance system monitor job.  (*Id*.)

Spears' attorney then questioned the VE, in pertinent part, as follows:

Q:       With regard to your testimony of the surveillance system monitor, you said something about you used updated data from the -- from the government on that one and I think you said not just for the numbers but also for the description of the job, is that  correct?

A:       Not from the government.  The government documents are quite dated.  Although industry sources on surveillance system monitors, central alarm and video monitors, so my information is coming from industry sources, not the typical government Occupational Outlook Handbook and other documents that the government publishes.

Q:      What is the industry source that you use then for the-- for that job?

A:       I don't know if I have that referenced right here.  Let me see if I have it.  I don't have that right in those notes right in front of me. The surveillance system monitor industry is rather large.  I've got over 120 firms in that business.  I didn't write -- I don't have the specific sources noted in my notes.

ATTY:  Would we -- Your Honor, since we're leaving the record open for a little bit of time, would he be able to supplement his testimony with a citation to that within the same time period, October 23rd? And then if I need to

18

respond to that at all.  And I only say that because your hypothetical # 5 when we get down to the sedentary sit/stand at will with the occasional handling and fingering –

ALJ:    Well, I can – maybe it doesn't matter, but it will be my opinion that if there's only one job that can be cited, that's not [a] significant number * * * so if I were to go with hypothetical #5 I would find in favor of Ms. Spears in this situation. * * So with that in mind, do you still need or want —

ATTY:  Probably not, given his testimony on the others.  So, instead of delaying things and it probably would be a moot point so * * * no, I don't need to make that request now, thank you.

(Tr. 77-79.)

## III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v.*

*Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Spears was insured on her alleged disability onset date, March 30, 2012, and remained insured through June 30, 2012, her date last insured ("DLI.") (Tr. 20-21.) Therefore, in order to be entitled to POD and DIB, Spears must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2012.

2.    The claimant has not engaged in substantial gainful activity since March 30, 2012, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.)

3.    The claimant has the following severe impairments: bipolar disorder, anxiety, borderline personality disorder, mood disorder, alcohol abuse, adrenal hypofunction, hypothyroidism, seizure disorder, asthma, chronic obstructive pulmonary disorder, sleep apnea, obesity, spinal degenerative disc disease, and fibromyalgia (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that she can frequently climb ramps and stairs, but can never climb ladders, ropes, or scaffolds.  She can frequently perform fine and gross handling bilaterally.  The claimant must avoid concentrated exposure to respitory irritants such as fumes, odors, dust, gases, and temperature extremes, and must avoid all exposure to hazards such as dangerous moving machinery and unprotected heights.  The claimant is limited to simple to moderately complex tasks with no strict time requirements or high production quotas.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on April ** 1970 and was 41 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.   The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability

21

because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 1).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.15691(a), 416.969, and 416,969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from March 30, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 20-33.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy*, 594 F.3d at 512; *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner

22

are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White*, 572 F.3d at 281; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely

23

overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

***Drummond*/RFC**

In her first assignment of error, Spears argues the ALJ erred in determining she is capable of frequent (as opposed to occasional) fine and gross handling.[7]  (Doc. No. 11 at 9.)  She notes the previous ALJ decision found Spears could only "occasionally handle," and "occasionally push or pull" with her upper and lower extremities.  (Tr. 91.)  The instant ALJ deviated from this finding, determining Spears could "frequently perform fine and gross handling bilaterally," and imposing no limitation on her ability to push or pull.  (Tr. 26.)  Relying on *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), Spears argues "there is insufficient reasoning as to why the ALJ found Spears had an increased capacity for work compared to the prior ALJ's decision."  (Doc. No. 11 at 10-11.)  This is especially so, Spears argues, in light of new and material medical evidence showing a worsening in Spears' condition and the ALJ's own determination that this evidence "reveals further limitations are warranted."  (*Id.*)  Spears also maintains the ALJ failed to "cohesively set forth his reasoning" for his credibility analysis as required by social security regulations.  (*Id.* at 14.)

The Commissioner acknowledges the instant ALJ "found there was new and material evidence warranting departure from the prior ALJ's RFC."  (Doc. No. 14 at 6.)  She maintains

---

[7]  The term "frequent" means occurring from one-third to two-thirds of the time.  SSR 83-10, 1983 WL 31251 at * 6.  "Occasionally" means occurring from very little up to one-third of the time.  *Id.* at * 5.

that, like the prior ALJ, the instant ALJ limited Spears to a reduced range of sedentary work and, in fact, specifically assessed greater postural restrictions than the prior ALJ.  (*Id.*)  The Commissioner maintains the instant ALJ properly determined Spears was capable of increased functioning with respect to her ability to handle and push/pull.  (*Id.*)  Moreover, she argues that, even if the ALJ erred in failing to sufficiently articulate his basis for assessing greater manipulative ability, Spears "has not shown how such error has harmed her, as is her burden." (*Id.*)  Rather, the Commissioner emphasizes the VE's testimony that, even with a restriction to occasional handling, Spears could nonetheless perform the job of surveillance system monitor, of which there are 291,000 jobs in the national economy.  (*Id.* at 7.)  Thus, the Commissioner asserts Spears has failed to demonstrate reversible error.

In her Reply Brief, Spears notes that, during the hearing, the ALJ specifically stated, if the surveillance system monitor job were the only remaining job, he would find "that's not a significant number" and he "would find in favor of Ms. Spears."  (Doc. No. 20 at 1.)  Relying on the ALJ's statement, Spears' counsel retracted his request that the record be kept open until the VE submitted information regarding the methodology and source of his testimony that there were 291,000 surveillance system monitor jobs in the national economy.  (*Id.*)  Spears asserts that "should this court agree with Defendant's argument that the [VE's] testimony may render the ALJ's error on this topic harmless, there remains a significant due process violation that deprived Plaintiff of her ability to fully cross-examine the [VE] in order to elicit favorable testimony which would have attacked the methodology, source, and calculation of the number of jobs available to an individual limited to sedentary work with only occasional use of her hands." (*Id.* at 3.)

25

In *Drummond*, the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Drummond*, 126 F.3d at 842 (relying on *Senters v. Sec'y of Health & Human Servs.*, 1992 WL 78102 (6th Cir. Apr. 17, 1991) (per curiam). *See also Dennard v. Sec'y of Health & Human Servs.*, 907 F.2d 598 (6th Cir.1990) (per curiam); *Blankenship v. Comm'r of Soc. Sec.*, 624 Fed. Appx. 419, 425 (6th Cir. Aug. 26, 2015). In that case, Drummond's initial claim for SSI was denied when an ALJ found that Drummond retained a RFC for sedentary work. *Drummond*, 126 F.3d. at 838. When Drummond later re-filed her disability claim, a second ALJ found that Drummond retained a RFC suitable for medium-level work—unlike the sedentary RFC finding of the first ALJ—and denied the re-filed claim. *Id*. at 839. After explaining that "*[r]es judicata* applies in an administrative law context following a trial type hearing," the Sixth Circuit held that the second ALJ was bound to the sedentary RFC determination of the first ALJ because there was no new or additional evidence of an improvement in Drummond's condition. *Id*. at 841–842. "Just as a social security claimant is barred from relitigating an issue that has been previously determined, so is the Commissioner." *Id*.

In response to *Drummond*, the Social Security Administration promulgated Acquiescence Ruling 98–4(6). The Administration explained:

> This Ruling applies only to disability findings in cases involving claimants who reside in Kentucky, Michigan, Ohio, or Tennessee at the time of the determination or decision on the subsequent claim at the initial, reconsideration, ALJ hearing or Appeals Council level. It applies only to a finding of a claimant's residual functional capacity or other finding required at a step in the sequential evaluation process for determining disability provided under 20 CFR 404.1520, 416.920 or 416.924, as appropriate, which was made in a final decision by an ALJ or the Appeals Council on a prior disability claim.

26

**When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.**

AR 98–4(6) (S.S.A.), 1998 WL 283902, at *3 (1998) (emphasis added) (footnote omitted).

As the Sixth Circuit recently explained, "[r]ead together, *Drummond* and Acquiescence Ruling 98–4(6) clearly establish that a subsequent ALJ is bound by the legal and factual findings of a prior ALJ unless the claimant presents new and material evidence that there has been either a change in the law or a change in the claimant's condition." *Blankenship*, 624 Fed. Appx. at 425. "New" evidence is evidence "'not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding.'" *Schmiedebusch v. Comm'r of Soc. Sec.*, 2013 WL 5749156 at * 9 (6th Cir. Oct. 24, 2013) (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990)). With regard to materiality, a claimant "must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir.1988). *See also Schiedebusch*, 2013 WL 5749156 at * 9.

Here, at step two, the prior ALJ found Spears suffered from a number of mental impairments, as well as the physical impairments of fibromyalgia, degenerative disc disease of the cervical and lumbar spine, sleep apnea with allergic rhinitis, asthma, and chronic obstructive pulmonary disease. (Tr. 88.) After determining Spears' impairments did not meet or equal the requirements of a Listing, the ALJ proceeded, at step four, to consider the medical and opinion

27

evidence regarding Spears' physical impairments.  (Tr. 88-97.)  In particular, the prior ALJ

discussed, at length, the medical evidence regarding Spears' fibromyalgia and chronic pain,

including her treatment history with Dr. Singh and various objective test results.  (Tr. 92-93.)  Of

particular relevance, the prior ALJ specifically noted the results of an MRI of Spears' cervical

spine in April 2011, which showed degenerative disc disease, mild canal encroachment, mild

impact on the signal cord, mild foraminal encroachment, and center disk extrusion.  (Tr. 94.)  In

addition, the prior ALJ acknowledged Dr. Singh had provided an opinion that Spears was

moderately limited in pushing, pulling, reaching, handling, and repetitive movements, and

severely limited in her abilities to sit and stand.  (Tr. 93.)  The ALJ "adopted most of this opinion

in formulating the" RFC, but rejected Dr. Singh's opinions as to Spears' sitting and standing

limitations.  (*Id*.)

> The prior ALJ formulated the following RFC:
>
> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she must be able to sit or stand alternatively, at will.  **She can occasionally push or pull.**  The claimant can never climb ladders, ropes, or scaffolds.  **She can occasionally handle.**  She must avoid all use of moving machinery and all exposure to unprotected heights.  The claimant is limited to work which involves simple, routine, and repetitive tasks, where there is no production rate or pace work, and where she would have occasional face to face interaction with the public or co-workers.

(Tr. 91) (emphasis added).

> In the instant decision dated December 14, 2015, the ALJ acknowledged the previous

ALJ decision, as follows:

> In accord with the holding in *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997), where a final decision on a prior disability claim contains the findings of a claimant's residual functional capacity, the Administration may not make a

different finding in the adjudication of a subsequent disability claim, unless there is new and material evidence or a change in circumstance that provide a basis for a different finding.  Unless the medical evidence demonstrates a change in the claimant's condition, I am bound by the findings of the previous Administrative Law Judge regarding residual functional capacity pursuant to Drummond.  **In this case, there is new and material evidence pertaining to the unadjudicated period that changes the prior residual functional capacity.  To support this finding, I would note that there are new objective studies (lumbar x-rays 9F/5 and 17F/35, cervical MRI 23F/77 and EMG studies 9F/12 and 18F/3 plus other) as well as numerous visits to multiple medical providers.**  There are also numerous visits to new psychological providers which include new GAF scores (6F) and at least one new medical opinion (13F).  **Consequently, I find that the claimant's condition has changed since the prior Administrative Law Judge's decision.  Therefore, I am not bound to adopt the residual functional capacity used in the prior opinion.**

(Tr. 20) (emphasis added).  The ALJ then determined, at step two, that Spears suffered from

several mental impairments as well as the physical impairments of adrenal hypofunction,

hypothryoidism, seizure disorder, asthma, chronic obstructive pulmonary disorder, sleep apnea,

obesity, spinal degenerative disc disease, and fibromyalgia. (Tr. 23.)  After determining Spears'

impairments did not meet or equal the requirements of a Listing at step three, the ALJ went on to

discuss Spears' self-reported limitations and the medical evidence regarding her physical

impairments.  (Tr. 23-29.)

The ALJ first acknowledged Spears' testimony that her spine, neck, hand, and finger

pain had "worsened," requiring her to wear a back brace and causing her difficulty with

everyday activities such as buttoning buttons and putting on jewelry.  (Tr. 26.)  In particular, the

ALJ noted Spears' testimony that "her condition has worsened overall since the date of the prior

unfavorable decision, and that although her pain medication allows her to function 'somewhat,'

she has experienced an increase in her stress levels, arthritis, and movement overall."  (Tr. 26-

27.)

29

The ALJ concluded Spears' impairments could reasonably be expected to cause her alleged symptoms; however, he found her statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely credible."  (Tr. 27.)  He first noted "the evidence in general demonstrates that the claimant has had conservative treatment for her degenerative disc disease and fibromyalgia symptoms and has often demonstrated no limitations in range of motion or gait."  (*Id*.)  The ALJ stated that "[a]lthough MRIs and EMG testing show some moderate disc disease and radiculopathy, her physicians have not suggested surgery or other invasive procedures."  (*Id*.)  The ALJ then discussed treatment notes relating to Spears' fibromyalgia and chronic neck/back pain, but noted she had normal strength, gait and station and "generally demonstrated no acute pain and ambulated without difficulty."  (*Id*.)  The ALJ remarked that, by October 2013, Dr. Singh indicated Spears' fibromyalgia was "stable" and required no intervention.  (Tr. 28.)  The decision also recounts new objective test results, as follows:

> The claimant underwent an MRI of the cervical spine in September of 2013 which showed moderate multilevel cervical spondylosis and canal stenosis (B8F/63).  Shortly thereafter, the claimant had EMG testing on her bilateral extremities that revealed cervical radiculopathy at the right C6 to C7 levels (B9F/12).

(*Id*.)  The ALJ concluded as follows:

> The claimant continued monthly visits to Dr. Singh and had fairly unremarkable examinations.  Although she continued to complain of back and neck pain, her fibromyalgia was noted to be "stable overall." . . .  The claimant also continued to visit Summit Pain Specialists, where she received injection therapy, narcotic pain medication, and an orthopedic back brace. She consistently reported that her pain treatment plan allowed her to accomplish her activities of daily living (B1/8F).
>
> From the above, the claimant has some limitations due to her various conditions.  However, her symptoms appear to be fairly well controlled with

her medications and she has a wide variety of daily activities, indicating that
her symptoms are not as severe as alleged.

(Tr. 28-29.)

With regard to the opinion evidence, the ALJ found as follows:

The State medical consultants opined that the claimant could perform work at
the sedentary exertional level; could never climb ladders, ropes, and scaffolds;
would be limited in her handling; and would need to avoid all exposure to
hazards such as machinery and heights (B4A/12).  **I give the opinion of these
experts in Social Security regulations little weight, since later records and
the claimant's testimony reveal further limitations are warranted**.  Thus, I
have further limited the claimant to the type of sedentary work described
above.

(Tr. 30) (emphasis added).

The ALJ formulated the following RFC: "After careful consideration of the entire

record, I find that the claimant has the [RFC] to perform sedentary work as defined in 20 CFR

404.1567(a) and 416.967(a) except that she can frequently climb ramps and stairs, but can never

climb ladders, ropes, or scaffolds.  **She can frequently perform fine and gross handling

bilaterally**.  The claimant must avoid concentrated exposure to respiratory irritants such as

fumes, odors, dust, gases and temperature extremes, and must avoid all exposure to hazards such

as dangerous moving machinery and unprotected heights.  The claimant is limited to simple to

moderately complex tasks with no strict time requirements or high production quotas."  (Tr. 26)

(emphasis added).

Upon careful review, the Court finds the ALJ failed to properly evaluate the medical

evidence regarding Spears' bilateral hand and finger pain and numbness.  As set forth above, the

previous ALJ considered the medical evidence and determined Spears was limited to "occasional

handling" and "occasional" pushing/pulling.  (Tr. 91.)  In the December 2015 decision, the

31

instant ALJ found there was "new and material evidence pertaining to the unadjudicated period," including new objective studies such as the August 2013 MRI of Spears' cervical spine and October 2013 NCT/EMG of her bilateral upper extremities.  (Tr. 20.)  The ALJ recounted the results of these new objective tests, noting the cervical MRI showed moderate multilevel cervical spondylosis and canal stenosis, and the NCT/EMG showed cervical radiculopathy. (Tr. 28.)

Notably, these new objective test results reflect a worsening of Spears' condition. Specifically, and as set forth *supra,* the April 2011 cervical MRI discussed in the previous ALJ decision showed only mild degenerative disc disease.  (Tr. 94)  The August 2013 cervical MRI, however, showed moderate multilevel spondylosis and stenosis, which was described as "mildly increased from the prior examination."  (Tr. 632-633.)  Moreover, the record reflects that a 2009 NCT of Spears' upper extremities was negative.  (Tr. 388.)  However, the October 2013 NCT and EMG showed (1) electro-physiological evidence of distal right median nerve mononeuropathy across the wrist; and (2) cervical radiculopathy at right C6 and C7 level.  (Tr. 646.)

Despite the fact that the new objective results showed a worsening in Spears' condition, however, the ALJ found Spears had greater manipulative abilities as compared to the prior ALJ decision; i.e, the prior ALJ assessed an "occasional" ability to handle objects while the instant ALJ found Spears had the ability to "frequently" handle objects.  The instant ALJ offers no explanation for his finding of increased manipulative ability.  This is problematic for several reasons.

First, pursuant to *Drummond*, the instant ALJ was bound to the findings of the previous

32

ALJ absent new and material evidence of a change in Spears' condition.  The ALJ found there was, in fact, new and material evidence relating to Spears' impairments and specifically cited the August 2013 MRI and October 2013 NCT/EMG, both of which reflected a worsening of Spears' impairments.  (Tr. 20.)  Moreover, later in the decision, the ALJ expressly found the opinions of state agency physicians Drs. Bolz and Lewis (both of whom limited Spears to occasional handling) were entitled to little weight because "later records and the claimant's testimony reveal **further limitations are warranted**."  (Tr. 30) (emphasis added).  Given these statements, it is unclear why the ALJ found Spears had greater manipulative abilities than that reflected in the previous ALJ decision.  The decision does not address this issue or otherwise explain the basis of ALJ's assessment.

Nor does the ALJ discuss much of the medical evidence relating to Spears' arm, hand and finger pain and numbness.  As noted *supra*, the treatment record reflects Spears repeatedly complained of pain and numbness in her upper extremities.  By way of example, the record reflects the following:

- In April 2012,  Spears complained of pain in her PIP joints, decreased grasp, and bilateral hand numbness.  (Tr. 422.)

- In August and October 2012, Spears stated her "arms go to sleep," and reported wrist pain, hand pain/cramping, reduced grasp, and morning stiffness.  (Tr. 381-382, 390.)

- In February, March, and June 2013, Spears complained of pain in her elbows, wrists, hands, and fingers.  (Tr. 399, 408-409, 415-421.)  She also reported her "arms sometimes fall asleep" and her hands are "very stiff."  (Tr. 702.)

-  In July 2013, Spears reported arm numbness/tingling and hand numbness.  (Tr. 597-599.)

- In August 2013, Spear complained of numbness, tingling, and cramping

33

in her hands and forearm "brought on with lifting and painting."  (Tr. 606.)

- In September 2013, Spears reported neck pain radiating down her arms and "causing them to go numb."  (Tr. 655.)

- In August 2013, a cervical MRI showed moderate cervical spondylosis and  moderate central canal stenosis and spinal cord deformity most severe at C5/C6 and C6/C7, "mildly increased from the prior examination."  (Tr. 632-633.)  An NCT/EMG showed evidence of distal right median nerve mononeuropathy across the wrist, and cervical radiculopathy at right C6 and C7.  (Tr. 646.)

- In October 2013, Spears reported intermittent numbness in her arms and hands, and stated "the pain radiates down her arms to her middle digits." (Tr. 644.)  Dr. Yang added a diagnosis of cervical radiculitis/brachial neuritis.  (Tr. 651.)

- In November 2013, Dr. Prestegaard noted pain on palpation to the PIP joint of the fourth finger of Spears' right hand, along with "some bony deformity" and reduced range of motion with flexion.  (Tr. 1038.)

- Spears continued to report pain, numbness, and tingling in her arms and hands in February and March 2014.  (Tr. 895, 874, 872.)  She was again diagnosed with cervical radiculitis/brachial neuritis.  (Tr. 876.)

- In October 2014, Spears complained of "intense cramping" in her hands. (Tr. 983.)

- In February 2015, Spears reported pain in her bilateral hands.  (Tr. 903.)

- In August 2015, Spears complained of pain in her elbows, wrists, and hands.  (Tr. 913.)

The ALJ does not evaluate any of the above treatment records or explain why this evidence warrants a finding of greater manipulative abilities than that assessed by the prior ALJ.

The Commissioner cites numerous treatment records and Spears' hearing testimony in support of the argument that "the ALJ's finding that Plaintiff could frequently perform fine and gross manipulative tasks is consistent with the record evidence."  (Doc. No. 14 at 9.)  However,

the ALJ did not include this analysis in his decision and the Court cannot engage in *post hoc* rationalizations. *See S.E.C. v. Chenery*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed.2d 1995 (1947) ("a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency"). As courts within this district have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration." *See, e.g., Peterson v. Colvin*, 2017 WL 535581 at * 16 (N.D. Ohio Jan. 25, 2017); *Blackburn v. Colvin*, 2013 WL 3967282 at * 8 (N.D. Ohio July 31, 2013); *Cashin v. Colvin*, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue*, 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012). Here, the various arguments now advanced by the Commissioner were not articulated by the ALJ as reasons for assessing greater manipulative limitations than that found by the previous ALJ. Accordingly, the Court rejects the Commissioner's *post hoc* rationalizations.

Acknowledging "the ALJ's decision is not a model of perfection," the Commissioner asserts any failure by the ALJ to sufficiently articulate his basis for assessing greater manipulative ability than the prior ALJ is harmless error. (Doc. No. 14 at 6, 10.) Specifically, she argues "two vocational experts found that sedentary work with additional restriction to occasional handling and fingering would not preclude all work activity and, in fact, would result in a significant number of jobs in the national economy." (*Id*. at 7.)

The Court rejects this argument. First, the Commissioner's reliance on the testimony of the previous VE is misplaced. It is true the previous VE testified there were jobs available for a hypothetical individual restricted to a limited range of sedentary work that included a restriction

to occasional handling.  However, the Commissioner has not asserted (or shown) that the hypothetical posed to the previous VE also contained the additional limitations assessed by the instant ALJ, i.e., restrictions to frequent climbing of ramps and stairs, and avoiding concentrated exposure to respiratory irritants such as fumes, odors, dust and temperature extremes.[8]  (Compare Tr. 26, 91.)  Thus, under the circumstances presented, the Court finds the previous VE's testimony is not sufficient to demonstrate there are significant numbers of jobs available with respect to the RFC assessed by the instant ALJ.

The Commissioner also relies on the instant VE's testimony that, even if the hypothetical individual were limited to occasional handling, the individual could still perform the hypothetical job of surveillance system monitor.  (Tr. 77.)  The VE further testified that, according to unidentified "industry sources,"  there are 291,000 such jobs in the national economy.  (Tr. 75-76.)  Based on this testimony, the Commissioner argues any error in the ALJ's analysis of Spears' manipulative limitations is harmless because there are sufficient jobs that she could perform even with a restriction to bilateral occasional handling.

The Court finds the Commissioner's argument to be without merit.  The VE testified the number of surveillance system jobs (i.e., 291,000) was not drawn from the "typical" government sources because such sources were "quite dated."  (Tr. 78.)  Rather, the VE obtained the information about the number of surveillance system monitor jobs from "industry sources."  (*Id.*)  When Spears' counsel asked the VE to identify those sources, the VE was unable to do so during

---

[8] The administrative record before this Court does not appear to contain the transcript of the hearing before the previous ALJ.  However, as the RFC assessed by the previous ALJ does not contain restrictions to frequent climbing of stairs/ramps or avoiding pulmonary irritants, the Court assumes the previous VE was not presented with a hypothetical containing these particular restrictions.

the hearing as that information was not in his notes.  (*Id.*)  Spears' counsel then asked the ALJ to

hold the record open to allow the VE to supplement his testimony to include the industry sources

he relied on in arriving at the 291,000 figure.  (*Id.*)  The following exchange then occurred:

> ALJ:  Well, I can – maybe it doesn't matter, but it will be my opinion that
> if there's only one job that can be cited, that's not [a] significant
> number * * * so if I were to go with hypothetical #5 I would find in
> favor of Ms. Spears in this situation.  * *  So with that in mind, do
> you still need or want —
>
> ATTY:  Probably not, given his testimony on the others.  So, instead of
> delaying things and it probably would be a moot point so * * * no, I
> don't need to make that request now, thank you.

(Tr. 78-79.)  Therefore, the VE did not submit information regarding the industry sources he

relied on to arrive at the 291,000 figure.

The Court finds it unclear whether substantial evidence supports the VE testimony and

the ALJ's step five finding in light of the fact that (1) the VE acknowledged his testimony was

not consistent with the government's own sources with regard to the number of surveillance

system monitor jobs; and (2) Spears relinquished the opportunity to examine this issue in reliance

on the ALJ's statement that he would find in Spears' favor if there was only one job remaining.

In other words, the ALJ decision fails to "build an accurate and logical bridge between the

evidence and the result, " thereby hindering this Court's review.  *Fleischer,* 774 F. Supp. 2d at

877 (quoting *Sarchet,* 78 F.3d at 307).  *See also Shrader v. Astrue*, 2012 WL 5383120 at * 6

(E.D. Mich. Nov. 1, 2012) (If relevant evidence is not mentioned, the Court cannot determine if it

was discounted or merely overlooked.").  Therefore, under the particular circumstances

presented, the Court rejects the Commissioner's argument that the ALJ's failure to sufficiently

articulate the basis for his manipulative restrictions constitutes harmless error.[9]

Accordingly, and for all the reasons set forth above, the Court finds the ALJ failed to sufficiently articulate his basis for restricting Spears to frequent (as opposed to) occasional handling and, further, that this error is not harmless. On remand, the ALJ shall fully consider and address the evidence regarding Spears' bilateral arm, hand, and finger pain and numbness in formulating the RFC, and clearly articulate the basis for assessed manipulative limitations.[10]

**Hypothetical**

In her second assignment of error, Spears argues, summarily, that "the finding that Spears is capable of frequent use of her hands is not supported by substantial evidence" and, therefore, "the answers to the hypothetical question posed [to] the vocational expert, which included the ability to frequently engage in 'fine and gross handling bilaterally,' cannot be considered substantial evidence supporting the ALJ's denial." (Doc. No. 11 at 17.)

The Commissioner argues, equally summarily, that any error in this regard is harmless as the VE testified that a limitation to only occasional handling would "still yield work existing

_____

[9] The Commissioner also asserts that "the state agency reviewing physicians, adopting the ALJ's residual functional capacity finding of sedentary work with occasional handling and fingering (among other limitations), also found that work existed in significant numbers in the national economy that Plaintiff could perform." (Doc. No. 14 at 7.) The Court rejects this argument. State agency physicians are neither qualified to make, nor responsible for making, the step five determination of whether work exists in significant numbers in the national economy that a particular social security claimant can perform. The Court further notes that both state agency physicians in this case restricted Spears to occasional handling, consistent with the prior ALJ decision.

[10]Spears also argues the ALJ failed to sufficiently articulate his analysis of Spears' credibility with respect to her alleged inability to use her hands and fingers for handling on more than an occasional basis. As this matter is being remanded for the reasons set forth above, the Court need not reach this issue. However, on remand, the ALJ should fully explain the basis for his credibility analysis with respect to this issue.

in significant numbers in the national economy." (Doc. No. 14 at 10.)

As this matter is being remanded for the reasons set forth in connection with Spears'
first assignment of error, the Court need not address this issue.  However, on remand, the ALJ
should consider whether additional VE testimony is necessary in light of the issues discussed
above.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's
final decision be VACATED and the case REMANDED for further proceedings consistent with
this decision.

_____*s/Jonathan D. Greenberg*_____
Jonathan D. Greenberg
United States Magistrate Judge

Date: November 21, 2017

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of
Court within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the
specified time may waive the right to appeal the District Court's order.  *See United States v.
Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474
U.S. 1111 (1986).**